## City of Louisville v. Bott's Admrx.

(Decided January 17, 1913.)

### Appeal from Jefferson Circuit Court. (Common Pleas Branch, Second Division).

1. Municipal Corporations—Street Construction—Ordinance Requiring —Dedication and Acceptance of Street—Action for Death Caused

by Defective Street.—As Monon Avenue was opened and constructed by the Monon Railroad Company as a street by virtue of an ordinance of the City of Louisville and as a condition of the Railroad Company's use of Fourteenth street, between Main and Market streets, for laying its tracks and operating its trains; and the city since its construction, has controlled it as a street and permitted it to be used as such by the public, it cannot escape liability for the death of a person caused by its negligence in failing to keep the street in a reasonably safe condition for the use of the travelling public, upon the ground that it had not been formally accepted as a street by it. The dedication and acceptance of the street were sufficiently shown by the ordinance requiring the railroad company to open and construct the street, and the city's control of it since its construction.

2. Municipal Corporations—Ordinance Requiring Repair of Street—Duty to Keep in Repair.—The fact that the ordinance requires the Monon Railroad Company to keep the street in repair, did not relieve the city of liability for an injury to a person resulting from the failure of the railroad company to do so. The obligation of the municipality to keep its streets in reasonably safe condition for public travel is imperative and a duty of which it cannot relieve itself, by attempting to shift the work of maintaining the streets upon another or others.

3. Municipal Corporations—Defective Street—Action for Death of Person—Negligence.—If, as alleged in the petition and appellee's evidence conduced to prove, her intestate, because of the defective and unsafe condition of Monon Avenue, was thrown to the ground from a wagon, loaded with a piano, and killed, appellant was liable in damages therefor, unless the intestate was at the time in charge of the removal of the piano and in control of the wagon and driver, and his death was caused by the negligence of the driver in permitting a wheel of the wagon to drop into a hole in Monon Avenue; in which event the negligence of the driver, being imputable to the intestate, would prevent a recovery.

4. Municipal Corporations—Evidence—Negligence—Question of Fact—Instruction.—As there was some evidence tending to show that the intestate was in charge of the removal of the piano and in control of the wagon and driver; and also some evidence to show that his death was caused by the negligence of the driver, the trial court should have submitted these two questions of fact, with the other issues of fact in the case, to the decision of the jury; and upon another trial of the case will do so under the additional instruction set out in the opinion.

LEON P. LEWIS, CLAYTON B. BLAKEY, HUSTON QUIN, for appellant.

ROBT. L. PAGE, O'DOHERTY & YONTS, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

Appellee, as administratrix of the estate of her deceased husband, John F. Bott, recovered of the appellant,

city of Louisville, in the court below a verdict and judgment for $6,500.00, damages for his death, alleged to have been caused by the negligence of the appellant, in failing to keep its street, known as Monon Avenue, in a reasonably safe condition for the use of the traveling public. The city complains of the judgment and the refusal of the circuit court to grant it a new trial; hence this appeal.

Although numerous grounds were filed in the court below in support of appellant's motion for a new trial, but two of them are relied on for a reversal of the judgment complained of; these are: (1) that Monon avenue was not such a dedicated street of the city of Louisville as to charge it with the duty of keeping it in a reasonably safe condition for the use of the traveling public. (2) That the trial court erred in refusing to instruct the jury, as requested by the city, that the negligence, if any, of the driver of the wagon from which the intestate fell and was killed, was imputable to the latter.

The first of these contentions is manifestly unsound. It appears from the record that an ordinance was passed by the city council in 1903 authorizing the Monon Railroad Company, to lay its tracks in and along Fourteenth street, a regular thoroughfare of the city of Louisville, in consideration of which the Monon Railroad Company agreed to open as a street for public use a strip of land lying parallel to Fourteenth street, and extending from Main street to Market street. Section eight of the ordinance provided:

"The owner of such franchise shall open and maintain for public use, as shown on plat annexed to this ordinance, a driveway running north and south from Main street to Market street lying west of Fourteenth street, as specified by dimensions in said plat."

By section nine of the ordinance it was further provided:

"That the purchaser of the franchise, provided in the ordinance * * * shall within ninety days after the passage of said ordinance, commence work in good faith to construct the tracks mentioned in said ordinance and to open the driveway therein mentioned, extending from Main street to Market street and shall within six months complete the construction of said tracks and open said driveway * * *."

It is shown by the testimony of numerous witnesses that the Monon Railroad Company complied with the

terms of the ordinance by opening the driveway or street in question in 1903, since which time the street has been known as Monon avenue and has been constantly used as a public street; during which time, as now, it was lighted by electric lights owned by the city and regularly policed and controlled by it, as any other street within its corporate limits.

Whether any part of it has been kept in repair since it was opened and established, by the city or the Monon Railroad Company, does not appear from the evidence.

The circumstances under which Monon Avenue was established made it as much of a public street as if it had been laid off and dedicated by the owner of the ground and accepted on the part of the city by an ordinance of its General Council, on the recommendation of the Board of Public Works, as required by section 2832, Kentucky Statutes, for it was opened and constructed by the Railroad Company upon an order of the city authorities and as a condition of the Railroad Company's use of Fourteenth street between Main and Market streets, for the laying of its tracks and operation of its trains. Indeed, the ordinance, supra, made it a street upon its completion as such by the Railroad Company, and the city's control of it as such since its completion, together with its use by the public, constituted an acceptance of it by the city as a street. In other words, the contract of dedication and acceptance is contained and expressed in the several provisions of the ordinance. Manifestly, a formal acceptance on the part of the city was unnecessary where it had expressly authorized the construction of the highway, in the first instance, for the use of the traveling public, and its construction was followed by such use of it. City of Louisville v. Hall, 28 R. 1065; Terrell v. Hart, 28 R. 903; Kaye v. Hall, 13 B. Monroe 458.

If it be true, as contended by appellant, that the contract between it and the Monon Railroad Company, requires the latter to keep Monon Avenue in repair, that fact cannot relieve the former of liability for an injury sustained by a person from a defect in the street, which renders it unsafe for use by the traveling public. In Thompson on Negligence, Volume 1, section 1205, it is said:

"The fact that under a municipal ordinance or otherwise, the city or town may be liable to the traveler injured, does not at all exonerate the abutting land owner

from liability since he is the primary wrongdoer and since the municipality, if compelled to pay the damages, has an action over against him as such. It is, therefore, not at all necessary that the person injured should first bring an action against the municipality; the primary author of the nuisance and the city are, in theory of law, under a common duty to repair, and are hence jointly and severally liable to the person injured, and the latter has his election to bring his action both jointly or against each separately." Will v. Village of Mendon, 66 N. W. 58.

The doctrine under consideration was approved by us in the case of Webster v. C. & O. Ry. Company, 32 R. 406, with reference to which it is in the opinion said:

"The obligation of the municipality to keep its streets in reasonably safe condition for public travel is unconditional, and this duty it cannot relieve itself of by attempting to shift the responsibility to an abutting owner. If injuries are sustained by reason of defective streets or side-walks, the person injured had a full and adequate remedy against the city and is not required to look to a property owner who might be insolvent, or a non-resident, or for other reasons incapable of being made to respond in damages. If the municipality could, by placing the liability upon the abutting property owner, relieve itself from the duty of keeping its streets in repair, it would have the effect of relaxing its care and supervision of them. Responsibility would be divided to the detriment of the public service."

If right in our rejection of appellant's first contention, of which we have no doubt, it follows that the trial court did not err in refusing the peremptory instruction directing the jury to find for appellant, asked by it at the conclusion of appellee's evidence.

Two things enter into the consideration of appellant's second contention, (1) was there any evidence on the trial which conduced to prove that the fall of appellee's intestate from the wagon, resulting in his death, was caused by the negligence of the driver of the wagon? (2) was there any evidence conducing to prove that the wagon and driver were under the control of the intestate at the time of the accident? If the record furnishes an affirmative answer to each of these questions, there would seem to be no escape from the conclusion that the trial court erred in refusing to submit

them, under a proper instruction, to the decision of the jury.

It appears from the bill of evidence contained in the record that appellee's intestate, who was a bartender in the saloon of his brother-in-law, Al. G. Byer, as agent of the latter purchased of C. W. Elliott, an electric upright piano for use in Byer's saloon. On January 7th, 1909, the intestate, in company with Thomas C. Small, another brother-in-law of his, and A. J. Zorn, went to the place of business of Elliott, in a wagon belonging to Henry Byer, a brother of Al. G. Byer, for the purpose of removing the piano to Al. G. Byer's saloon. Zorn was a driver in Henry Byer's employ and had requested the latter to permit him to use his feed wagon for the purpose of hauling the piano from Elliott's establishment on Third Street to the saloon. Upon reaching Elliott's store, the piano was placed in the wagon following which the vehicle was started upon its return to the saloon. The intestate, Zorn, Small and Raible, the latter an employe of Elliott, were all in the wagon. Zorn was acting as driver; Small sat on the front seat of the wagon with him, and the intestate and Raible stood on opposite sides of the piano each supporting it with a hand to prevent it from toppling over. When the wagon entered Monon Avenue, a short distance north of Market Street, the front wheel thereof ran or dropped into a hole into the street, which caused the intestate to fall from the wagon into the street, and the piano to fall from the wagon upon his body. The other occupants of the wagon were not thrown out. When the others went to Bott, they discovered that his skull had been crushed by contact with the street or piano, and he lived but a few minutes after the accident.

The evidence of appellee conduced to show that the cause of the accident was the defective condition of the street, and that the hole, into which the front wheel of the wagon dropped, was caused by the loosening and displacement of the brick of which it was constructed, and was from six inches to twelve inches in depth, about eighteen inches in length, and not less than twelve inches in width. Some of her witnesses testified that the hole was of still greater width and depth, and nearly all of them further testified that it had existed in the street for several months before the accident occurred.

On the other hand, numerous witnesses introduced in behalf of appellant, testified that the hole was not nearly so large or deep as described by the appellee's witnesses; some of them fixing its depth at only one or two inches. One of these witnesses, Lennon, testified that the depth of the hole did not exceed an inch and amounted to nothing more than a slight depression in the street.

While the evidence as to the character and extent of the defect in the street was conflicting, it was all one way as to the fact that the defect, such as it was, had continued several months, and consequently a sufficient time for the city authorities, charged with the duty of keeping the streets in repair, to have been informed of its presence.

We are unable to agree with the assertion or appellee's counsel that there was no evidence of negligence on the part of Zorn, the driver. There were three witnesses whose testimony tends to show such negligence, Raible, Monroe and Runner. The latter, who was painting at a point where he was passed by the wagon when or after it entered Monon Avenue, testified that the wagon was driven unusually fast, and though he had turned his head just before the accident, and for that reason did not see the intestate or the piano fall, hearing the noise made by the fall of the piano, he again looked in that direction, saw it and a man lying in the street, and upon looking at the wagon, noticed that it had gone perhaps a hundred feet beyond the place of the accident before it was stopped. This would seem to confirm his statement that the wagon in approaching the place of the accident, was being driven unusually fast.

Monroe passed the wagon as it was entering Monon Avenue immediately before the accident. He said the driving was fast; that he noticed the unsteadiness of the piano, the topheaviness of the load, and regarded the pace too fast for safety. Raible, the employe of Elliott, rode in the wagon to assist in carrying the piano to Byer's saloon. He stood beside the piano opposite the intestate and like the latter, supported it with his hands. According to his testimony, Zorn drove the horse attached to the wagon at a "dog trot." While he did not say, in words, the driving was fast, in view of the height, weight and unsteadiness of the piano, he said he regarded the pace too fast for safety and advised

the intestate to have Zorn drive at a slower gait. He also testified that Zorn was directed by the intestate to drive slower, but evidently the order was not obeyed, as Raible further testified that upon the wagon's entering Monon Avenue and until the accident, the horse was still going in a "dog trot."

One of these witnesses also testified that the men in the wagon seemed to be talking, laughing and having a good time. There was also evidence that Bott, Zorn and Small each took a glass of beer before starting in the wagon to Elliott's; that they, Elliott and Raible took another beer each after loading the piano at Elliott's, and Bott, Zorn, Small and Raible still another between Elliott's and the place of the accident. The evidence failed to show, however, that any of the persons named were drunk. But it can fairly be said that the foregoing facts testified to by Raible, Monroe and Runner, furnish some evidence of negligence on the part of the driver, Zorn.

It is true, Zorn and Small, and two or three other witnesses who saw the wagon on the way to Monon Avenue, testified that there was no fast driving. Zorn himself said that they were going at a "dog trot" when the accident occurred, and Small, that they drove in a slow trot. The former also testified he did not see the hole in the street until the wheel of the wagon dropped into it; that at the time of the accident, he was watching other vehicles in the street in order to avoid collision with them; and that it was a gloomy afternoon and approaching dusk. All the witnesses who testified as to the accident, said the sun was not shining, but nearly all of them fixed the time of the accident about three o'clock, and agreed that there was sufficient daylight for safe driving.

The foregoing evidence, though conflicting like that as to the defect in the street, was allowed to go to the jury, but, as we shall presently see, the instructions given did not allow it to be considered by the jury as affecting the intestate's control of the vehicle and driver.

This brings us to the consideration of the further question, was there any evidence tending to show that the intestate was in control of the driver and vehicle? Two witnesses, Elliott and Raible, testified that he was. Their testimony carefully analyzed amounts to more than a mere expression of opinion by each of them and is supported by the following facts of very considerable

weight. The intestate conducted for Byer all the negotiations with Elliott resulting in the procurement of the piano for the saloon of Byer; he likewise got Zorn to obtain of Henry Byer, the use of the wagon to remove the piano to the saloon, and he alone had charge of its removal. If the crew of hands that went in the wagon for the piano and loaded and attempted to return with it had a head or chief at all, it must have been Bott, the brother-in-law and trusted employe of Byer, in whose saloon it was to be used; and if, as was undoubtedly the case, he was trusted by Byer with the purchase of the machine, what was more natural than that he should have been entrusted with its removal and control of the wagon and driver by which it was hauled. Besides, he was recognized by the persons in the wagon as in charge of it, for, as they were returning with the piano, Raible appealed to him to have Zorn drive slower, and he gave Zorn the command to do so as requested. In view of these facts, we are of the opinion, that there was some evidence conducing to prove that Bott was in charge of the wagon and in control of the driver; and this being true, the jury should have been allowed to determine whether he had such control, and also to determine whether the negligence of the driver, if there was any, was imputable to Bott. This should not have been done under the instruction on that point offered by appellant, as it did not fully state the law, but should be done under a proper instruction given by the court, expressed as follows:

If the jury believe from the evidence that the plaintiff's intestate, John F. Bott, was the agent of Al. Byer to take charge of the removal of the piano from Elliott's store to Byer's saloon, and that he had charge of the wagon and men removing the piano and control of the driver of the wagon; and shall further believe from the evidence that the driver's negligence, if any there was, so contributed to Bott's death, that but for such negligence, if any, he would not have been killed, such negligence of the driver, if any there was, is to be imputed to Bott, and the jury should in that event find for the defendant.

We think the above instruction, with those given on the former trial, qualifying No. 3, to conform to the one above, will fully advise the jury of all the law of the case.

We are of opinion that the plea in the usual form of contributory negligence on the part of the intestate, con-

tained in the answer, will authorize the giving of the above instruction, without setting forth that such negligence was in fact that of the driver imputable to the intestate. For if the latter was in control of the wagon and driver, he stood with respect to the transaction in the place of the master, and so the negligence of the driver may in the plea be stated to be that of the master.

In 29 Cyc., 545, the doctrine referred to is thus stated: "It is a universal rule that the negligence of a servant is imputable to the master to prevent recovery by him for injuries to which the servant's negligence contributes, in other words, the master assumes the risk of the negligence of the employe, unless the negligent act of the servant was not committed while acting within the scope of his employment. And this rule is carried to the extent that knowledge of danger on the part of the servant is also imputed to the master. Unless the relation of master and servant exists between the parties, the acts of one, although done in the interest of the other, will not be imputed to the other." L. & N. Railroad Company, v. Armstrong, 127 Ky., 327; Toner's Admr. v. Sou. Cov. & C. St. Ry. Co., 109 Ky., 41; Schlenk's Admr. v. Cent. Pa. ss. Ry. Co., 15 R. 409. Cass v. Third Ave. R. Co., 47 N. Y. Supp. 356; Schron v. Staten Island Electric Co., 45 N. Y. Supp. 124; Dunn v. Old Colony Street Ry. Co., 186 Mass. 316; Dryden v. Penna. R. R. Co., 211 Pa., 620.

For the reasons indicated, the judgment is reversed, and cause remanded for a new trial consistent with the opinion.